UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT DRAWN,

    Petitioner,

v.

ROBERT NUESCHID,

    Respondent.

Case No. 19-cv-02150-SI

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Robert Drawn filed this *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his conviction in the Alameda County Superior Court. This Court issued an order to show cause why the writ should not be granted. Respondent has filed an answer and Drawn has filed a traverse. For the reasons discussed below, the petition will be DENIED.

**BACKGROUND**

A. <u>Facts of the Case</u>

The California Court of Appeal described the evidence relating to the crimes in which Waleed Wheatfall was killed and Kennith Robinson was wounded:

> The shootings occurred near the intersection of 57th Avenue and Foothill Boulevard in Oakland, where Drawn operated an auto detailing service out of a space he leased from a car wash. Drawn typically parked his blue van with large rims at the car wash or on the street nearby.
>
> On the day of the shootings the owner of the car wash saw Drawn conversing with Wheatfall. From their body language, "[i]t seemed like, you know, points were trying to be made." Later the owner heard gunshots, crossed the street and saw Robinson, in his car, shot.
>
> That afternoon M. LeClaire was sitting in his parked truck at the car wash when he noticed a "big African-American guy with a full beard" in a truck parked next to his. The man was "talking really loud" and apparently arguing

with someone. A few minutes later a blue van with big rims pulled in and parked in front of LeClaire's truck. Drawn got out of the van and the bearded man got out of his truck. Both were yelling and Drawn said "Come on. I'm gonna go knock this nigga's head off. Let's go knock this nigga's head off." The two crossed the street to the Safeland Market parking lot, where a man approached Drawn and extended his right arm as though to shake his hand. Drawn drew a gun, shot the man several times, then walked up to a parked car and "shot whoever was sitting there through the window." The bearded man ran back to his truck and drove away. Nobody returned to the blue van.

The next day police showed LeClaire a photo lineup. He recognized Drawn as the shooter, but did not want to get involved so he told police he did not recognize anyone. About six weeks later police showed LeClaire another photo lineup. This time he identified Drawn "[b]ecause I didn't feel I was so much under pressure like the first time," but said he was only 50 percent sure because he was afraid for his family's safety. He testified at trial that he lied to police about being uncertain and lied again at the preliminary hearing because he was afraid of repercussions from Drawn or his friends. LeClaire decided to do "the right thing" after the prosecutor promised to protect his family, and at trial testified he was certain Drawn was the shooter.

Robinson testified he was hanging out with Wheatfall at the Safeland Market the day of the shooting. He observed Wheatfall and Drawn having a conversation. Drawn left but returned 15 or 20 minutes later. Robinson thought he and Wheatfall were going to get jumped, so got into his car to put his phones away "[s]o I wouldn't break them if I get into a fight or something." Moments later he heard gunshots. Robinson was shot three times as he sat in his car.

Robinson called 911. A recording of his call was played for the jury. He said the shooter was "the guy at the detail shop across the street" and had a blue van. Five days later Robinson identified Drawn as the shooter from a six-pack photo lineup on which he circled and initialed Drawn's photograph.

At trial Robinson was a reluctant witness. He testified he never saw the shooter and did not remember being shown or making an identification from a photo lineup. But, he conceded that he recognized his handwriting and initials next to Drawn's photo. He later told police he did not know what he was doing when he identified the shooter because he was on medication. Robinson told the prosecutor that people who grow up in Oakland "are not supposed to come to court and testify . . . about what happened."

A. Williams and R. Lee drove to Safeland Market to see Wheatfall shortly before the shootings. Williams got out of the car and greeted Wheatfall. Then they heard gunshots. Lee looked around and saw a tall man in a hoodie and baseball cap shooting a gun toward the ground. She ducked and tried to drive away, but her car ran over "somebody or something" so she stopped and got out. Williams had run behind the market when he heard shots but came back to look for Wheatfall. Wheatfall was dead, his body pinned under Lee's car. The cause of death was multiple gunshot wounds. Neither Williams nor Lee was able to identify the shooter.

Drawn never returned to the car wash for his van and stopped visiting his children's mother not long after the shooting. He called her two or three times per month, but he blocked his phone number and would not disclose his whereabouts.

2

United States District Court
Northern District of California

> Police found a blue baseball cap in the direction the shooter was seen fleeing from the crime scene. DNA on the cap was consistent with Drawn and could have come from him, but a statistical analysis was not possible due to the quality of the sample.
>
> Drawn was arrested in Southern California almost a year and a half later. A jury found him guilty of first degree murder and attempted murder, each enhanced for his use of a firearm, and three firearms offenses. Sentenced to 84 years to life in prison, Drawn filed this timely appeal.

Docket No. 7-12 at 89-92.

B. Procedural History

At a jury trial in Alameda County Superior Court in December 2015, Drawn was convicted of first-degree murder, attempted murder, unlawful transportation of an assault weapon, and two counts of possession of a firearm by a felon, with enhancements on the murder and attempted murder counts for personal use of a firearm. Docket No. 1 at 1–2. Drawn was sentenced to 84 years to life. Drawn's conviction was upheld on appeal to the California Court of Appeal. Docket No. 7-12 at 89. The California Supreme Court denied Drawn's petition for review. *Id.* at 133. Drawn twice filed unsuccessful habeas petitions in the California Court of Appeal and twice filed unsuccessful habeas petitions in the California Supreme Court. *See id*. at 138-215.

On April 22, 2019, Drawn filed this action seeking federal habeas relief on both a Confrontation Clause claim under the Sixth Amendment to the United States Constitution and an Equal Protection Clause claim under the Fourteenth Amendment. Docket No. 1. This Court then ordered respondent to show cause why the petition should not be granted. Respondent filed an answer. Drawn then filed his traverse. The case is now ready for review on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for the claims presented in the petition.

## LEGAL STANDARD

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). When there are no Supreme Court cases that answer questions raised in a federal habeas petition "it cannot be said that the state court unreasonably applied clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006)).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions

4

but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id*. at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id*. at 102.

**DISCUSSION**

A. The Confrontation Clause Claim

1. State Court Proceedings

Drawn contended on appeal, as he does here, that the admission of witness testimony concerning statements made in an anonymous 911 call violated his rights under the Sixth Amendment's Confrontation Clause. In the call, the anonymous caller told the 911 operator that

5

the suspect ran south from the crime scene and dropped his blue baseball cap, describing where the police could find the cap. Before trial, the prosecution moved *in limine* to introduce a recording of this anonymous 911 call. Docket No. 7-12 at 92. The court decided that the recording was not a spontaneous utterance and therefore was only admissible at trial for purposes other than showing the truth of the matter asserted. *Id*. at 92–93.

At trial, two witnesses for the prosecution described information gained from the anonymous 911 call, although neither witness directly referenced the call. First, Technician Boyle testified that she placed a placard next to a baseball cap found near the shootings because she "*was advised* that the suspect fled southbound on foot." Docket No. 7-9 at 12 (emphasis added). The court overruled a hearsay objection and explained to the jury that the testimony "would be hearsay if offered to prove that, in fact, the suspect fled that direction" but that the testimony was being offered to explain "why she placed the placard [next to the baseball cap]" and that explained her conduct, regardless of whether it was true that the suspect fled in that direction. *Id*. Second, Detective Rosin testified that he ordered the baseball cap to be tested for DNA because he "*had information* that the suspect in this crime had ran from the crime scene on foot in a southern direction which would cover [the area where the cap was located]." Docket No. 7-10 at 81 (emphasis added). Again, the court admonished the jury that Detective Rosin's testimony was admissible only to explain why Detective Rosin ordered the baseball cap to be tested for DNA, not to prove that the suspect actually ran south from the crime scene. *Id*. at 82.

The California Court of Appeal did not discuss the Sixth Amendment Confrontation Clause claim and instead focused on the related state law inadmissible hearsay claim. Docket No. 7-12 at 92–95. The state appellate court concluded that the evidence regarding the 911 call was properly admitted for a nonhearsay purpose. *Id*. at 92. The court explained how evidence—which otherwise would be hearsay—cannot be admitted simply because a nonhearsay purpose is identified. *Id*. at 94–95. For the evidence to be properly admitted, this nonhearsay purpose must also be relevant to a disputed fact. *Id*. The state appellate court ruled that, because Drawn had argued the police had conducted a "sloppy and biased investigation," evidence tending to show a nonbiased motive to test the baseball cap for DNA rebutted Drawn's argument. *Id*. Therefore, the California Court of Appeal

6

concluded that the evidence relating to the 911 call was properly admitted because it was admitted for a nonhearsay purpose that was relevant to a disputed fact. *Id*. at 95.

When, as here, the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

2. Analysis

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause applies to all "testimonial" statements. *Crawford v. Washington*, 541 U.S. 36, 50-51 (2004). However, "[t]he clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id*. at 59 n.9.

Confrontation Clause errors are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (post-*Crawford* case); *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the harmless standard applicable to violations of the Confrontation Clause is whether the improperly admitted evidence had "'substantial and injurious effect or influence in determining the jury's verdict.'" *Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

a. The Evidence Was Testimonial

As the Confrontation Clause only applies to testimonial statements, the first question is whether evidence of the anonymous 911 phone call was testimonial. The "primary purpose" test establishes the boundaries of testimonial evidence. *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015). Under this test, statements are testimonial: (1) "when they result from questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal

7

prosecution,'" and (2) "when written statements are 'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial.'" *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018) (quoting *Davis*, 547 U.S. at 822, and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009)).

Emergency 911 calls are sometimes considered testimonial but sometimes are not. *See Davis*, 547 U.S. at 822. When the primary purpose of the police questioning over the phone is to respond to an ongoing emergency, the 911 call is not testimonial. *Id*. On the other hand, when the circumstances show that there was no on-going emergency and that the primary purpose of the interrogation over the phone was to "establish or prove past events potentially relevant to later criminal prosecution," the 911 call is testimonial. *Id*. The following circumstances all indicate that the 911 call is less likely to be testimonial: if the caller is in imminent danger while on the 911 call; if the caller is relating events that are actually happening as opposed to past events; and if the interrogation is less formal and the caller seems more frantic. *See id*. at 827.

Here, as Drawn argues in his traverse, the evidence about the substance of the 911 call was testimonial because it was to establish past events that were potentially relevant to a later prosecution rather than to respond to an ongoing emergency. *See* Docket No. 11 at 2. As the California Court of Appeal also noted, the call was made shortly after the shooting occurred, not during the shooting. Docket No. 6-1 at 14. The questions asked by the 911 operator concerned the location of the dropped baseball cap, the color of the suspect's car, the color of the cap, and the description of the suspects. *Id*. at 15. These questions were all related to past events that had already occurred. Also, the anonymous caller did not seem particularly frantic or frightened because of some imminent danger. *Id*. at 15. Though the caller did seem concerned about the police inadvertently revealing his identity, he did not face an imminent threat of harm. *Id*. Therefore, evidence about the substance of the anonymous 911 call is testimonial evidence.

b. The Testimonial Evidence Was Properly Admitted for a Purpose
Other Than the Truth of the Matter Asserted

There is one important exception to the general rule that the Confrontation Clause applies to testimonial statements: the Confrontation Clause does not bar the use of testimonial statements for

8

purposes other than establishing the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9; *see Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009) (finding state court properly admitted son's out-of-court statement to social worker that his father had kicked his mother; statement was introduced to show why social worker contacted Child Protective Services, not to prove defendant had kicked the victim).

Here, the evidence was introduced for the purpose of explaining the conduct of police technician Boyle and Detective Rosin, regardless of whether it was true that the suspect ran south from the crime scene. The information from the anonymous 911 phone call tended to prove the motive of both Technician Boyle and Detective Rosin in searching for the blue baseball cap, marking the cap, and testing it for DNA. *See* Docket No. 7-12 at 95. Without the evidence of the phone call, Technician Boyle and Detective Rosin's behavior may have been challenging to explain. With the evidence, the jury was able to understand what made these persons behave the way they did. Therefore, the exception to the general rule from *Crawford* applies and evidence relating to the anonymous 911 phone call is admissible.

Drawn argues that the nonhearsay purpose for the evidence—to show why the police marked and tested the baseball cap—was not relevant. Docket Nos. 1 at 22, 11 at 4. This Court disagrees. A main defense theory was that the police had decided that Drawn was the shooter and had disregarded any evidence that might have pointed to someone else. Defense counsel urged this theory in her opening statement to the jury: "This is a case where the police focus their investigation immediately on Mr. Drawn and ignored evidence of other possibilities. The police had tunnel vision. They had a theory about who did the shooting, and they did everything they could to support that theory." Docket No. 7-7 at 22.[1] Regardless of whether the information was correct that the

---

[1] Defense counsel returned to this theme in her closing argument, as she hammered on the tunnel-vision theory repeatedly. Docket No. 7-11 at 40-42, 63; *see, e.g., id.* at 40 (("I did mention tunnel vision, and that's because the police in this case had tunnel vision. The police were focused from the very beginning on Mr. Drawn as a suspect in the case, and they focused their investigation on that theory."); *id.* at 41 ("The police started with their conclusion – they started with the conclusion that Mr. Drawn committed these crimes, and they worked backwards to support that conclusion, and that is not the way an unbiased investigation works."); *id.* at 42 ("Police in this investigation looked for what they wanted to hear. If it didn't fit their theory, then they disregard it as lies and fears with no basis to support that."). The prosecutor also mentioned that defense counsel had begun the trial with an argument that the "police had tunnel vision" and the prosecutor tried to

9

suspect dropped the baseball cap, by showing that a technician marked the baseball cap as evidence and the lead investigator ordered the baseball cap tested for DNA evidence when neither knew whether Drawn was connected to the baseball cap, the prosecution was able to show that the police were doing a normal investigation rather than an investigation focused solely on proving that Drawn was the shooter. The evidence showed an unbiased investigation rather than a biased one.

The California Court of Appeal reasonably could have used the above line of reasoning to conclude the admission of the information from the anonymous 911 phone caller was not a violation of Drawn's Sixth Amendment right to confrontation. This reasoning is not inconsistent with prior holdings by the United States Supreme Court because *Crawford* explicitly permits the admission of testimonial statements that are introduced for a purpose other than proving the truth of the matter asserted. Therefore, the state court's conclusion that there was not a Confrontation Clause violation does not warrant federal habeas relief.

### c. Harmless Error

Even if there was a Confrontation Clause violation, the Court concludes that any such error would be harmless. An error is harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In general, this inquiry is guided by several factors: "the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case." *Whelchel v. Washington*, 232 F.3d 1197, 1206 (9th Cir. 2000) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)); *accord Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009). A proper limiting instruction makes an error more likely to be harmless. *United States v. Lane*, 474 U.S. 438, 450, 106 S. Ct. 725, 732 (1986). Also, a longer jury deliberation relative to the length of the trial can indicate the error was not

---

show in his closing argument that was not true. Docket No. 7-11 at 16; *see also id.* at 17, 28, 39. He again chipped away at the tunnel-vision theory in his rebuttal argument. Docket No. 7-11 at 68, 69, 77, 79.

harmless while a short deliberation can indicate otherwise. *See United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001); *see also United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007).

The prosecution introduced substantial evidence that corroborated the statements made by the anonymous 911 phone caller, who provided the information that the suspect fled in the direction where the baseball cap was found. Most notably, a video showed the suspect fleeing south from the crime scene wearing a baseball cap. Docket No. 7-12 at 95. In addition, the baseball cap contained DNA that was consistent with Drawn's DNA, though it could not be confirmed because of the quality of the sample. Docket No. 7-9 at 88–91. The prosecution also introduced eyewitness testimony from one witness (LeClaire) who saw Drawn shoot one victim (Wheatfall) and then shoot another victim (Robinson) in a car nearby. Though LeClaire initially did not recognize Drawn in a photo lineup, six weeks later LeClaire identified Drawn in a photo lineup but said he was only "50 percent sure." Docket No. 7-7 at 109. Finally at trial, LeClaire stated that he initially lied to the police about his certainty because was afraid for his life and for his family. *Id* at 109–10. Once the prosecution promised to protect his family, LeClaire testified at trial that he was certain Drawn was the shooter. *Id* at 113–14. The victim Robinson also testified that he saw Drawn with Wheatfall right before the shooting, heard gunshots, and then was shot while sitting in his car. Robinson identified Drawn from a photo lineup five days after the shooting but was a reluctant witness at trial, telling the prosecutor that people who grow up in Oakland are not supposed to come to court and testify about what happened. *Id*. at 28. There also was evidence that Drawn fled the Oakland area where the shooting occurred—leaving behind his van, his family, and his business—and remained away until he eventually was arrested a year and a half later in Southern California.

Also supporting the conclusion that any error was harmless is the fact that the trial court gave limiting instructions. The trial court also admonished the jury to not use the evidence relating to the 911 call to decide the truth of the matter asserted. On the two occasions the evidence was presented, the trial court told the jury that the evidence relating to the 911 call could only be used to explain Technician Boyle's and Detective Rosin's conduct. Docket No. 7-9 at 12; Docket No. 7-10 at 82. The trial court also gave the jury a limiting instruction with regard to the same evidence at

11

the end of trial. Docket No. 7-11 at 91. Drawn has not provided any reason to depart from the normal presumption that jurors follow the court's instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).

The relatively brief jury deliberation support a finding of harmlessness of any Confrontation Clause error. After a seven-day trial, the jury apparently took less than half a day to deliberate. The jury only took two hours to deliberate on the day of closing arguments and returned a verdict the following morning. Docket No. 7-4 at 39–41. This short jury deliberation relative to the length of the trial indicates that the jury did not have difficulty in coming to a consensus. Therefore, any error that may have occurred is less likely to have actually changed the outcome of the verdict. "'Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'" *United States v. Lopez*, 500 F.3d at 846 (quoting *United States v. Velarde-Gomez*, 269 F.3d at 1036); *see, e.g., id.* (2.5-hour jury deliberations in illegal reentry case suggested any error in allowing testimony or commentary on defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036 (4-day jury deliberations in a two-count drug case supported inference that impermissible evidence affected deliberations). The half-day jury deliberations suggest the jury did not struggle with this case and weigh in favor of finding that any error in admitting the 911 caller's statements was harmless.

Based on the strength of the prosecution's case, the corroboration of the anonymous phone call by the video, the witnesses' identification of Drawn as the shooter, the trial court's proper limiting instructions, and the length of jury deliberations, the court concludes that any error with respect to the admission of evidence of the anonymous 911 phone call was harmless under the standard in *Brecht*. Therefore, even if an error occurred, Drawn is not entitled to habeas relief on his Confrontation Clause claim.

B. The Equal Protection Clause Claim

Drawn contends that his Fourteenth Amendment right to equal protection was violated when the trial court refused to resentence him under a later-enacted law that provided sentencing discretion with regard to a sentence enhancement for use of a firearm. The trial court lacked that

12

discretion when it originally sentenced him.

1. Background

When Drawn was sentenced in December 2015, he received two sentence enhancements of 25 years to life under California Penal Code § 12022.53(d) based on findings that he had used a firearm in both the murder and the attempted murder. *See* Docket No. 7-4 at 81–84 (abstract of judgment). Sentence enhancements under California Penal Code §§ 12022.5(a)(1), 12022.53(b), and 12022.53(c) were stayed. *See* Docket No. 7-4 at 81–84. At the time of Drawn's sentencing, California courts did not have the discretion to strike or dismiss a sentence enhancement allegation or finding regarding use of a firearm.

On October 11, 2017, the Governor of California signed Senate Bill 620 (SB 620), a law that ended the statutory prohibition on a court's discretion to strike or dismiss a firearm enhancement allegation or finding. SB 620 amended California Penal Code sections 12022.5(c) and 12022.53(h) to provide that "[t]he court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." These will be referred to as the "SB 620 amendments."

The SB 620 amendments went into effect on January 1, 2018. Subsequent California cases have held that the SB 620 amendments do "not apply retroactively to cases that [have become] final." *People v. Hernandez*, 34 Cal. App. 5th 323, 326 (2019) (citing *People v. Johnson*, 32 Cal.App.5th 938 (2019)). This created two classes of persons: those whose convictions became final before January 1, 2018, and those whose convictions became final on or after January 1, 2018.

After Drawn's conviction became final on November 7, 2017, he sought resentencing when the statutory amendments brought about by SB 620 became law.[2] He contended that denying the

---

[2] Drawn argued in state court (as he does here) that his conviction had not yet become final when SB 620 was enacted. The Alameda County Superior Court rejected his argument, finding that the conviction became final 90 days after the California Supreme Court denied review on August 9, 2017, i.e., the conviction became final on November 7, 2017, before the SB 620 amendments took effect on January 1, 2018. The Alameda County Superior Court also explained that the California courts had "unanimously" concluded that the SB 620 amendments' grant of discretion to strike firearm enhancements applied only to "nonfinal convictions," which Drawn's was not. Docket No. 7-12 at 212. The Alameda County Superior Court's decision is a state law determination that this

13

superior court the discretion to strike or dismiss a firearm enhancement allegation or finding in his case amounted to a difference in treatment that violated his rights under the Equal Protection Clause. The superior court rejected his argument. The superior court determined that Drawn's conviction became final before SB 620 became effective and that the failure to apply the SB 620 amendments retroactively to his case did not violate Drawn's right to equal protection. Docket No. 7-12 at 212.

> [Drawn,] who was convicted and sentenced before the enactment of SB 620, is not similarly situated, for purposes of the law, to someone [whose] case was not yet final when SB 620 was enacted. "'[T]he Fourteenth Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time.'"

Docket No. 7-12 at 213 (quoting *People v. Floyd*, 31 Cal. 4th 179, 181 (Cal. 2003) (quoting *Sperry & Hutchinson Co. v. Rhodes*, 220 U.S. 502, 505 (1911))).[3]

Drawn raised his Equal Protection Clause claim again in petitions for writ of habeas corpus in the California Court of Appeal and the California Supreme Court. Both of those courts summarily denied his claim.

When, as here, the most recent state opinion on the merits provides no explanation, the federal court can presume that the "unexplained decision adopted the same reasoning" as the reasoned decision from a lower state court. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). This court thus considers whether the Alameda County Superior Court's rejection of the equal protection claim was contrary to, or an unreasonable application of, clearly established federal law as set forth by the U.S. Supreme Court.

---

court does not revisit. *Hicks v. Feiock*, 485 U.S. 624, 629 (1988) (court is not free to review state court's determination of state law); *see id.* at 630 n.3 (quoting *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 237-38 (1940) (determination of state law made by an intermediate appellate court must be followed and may not be "'disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise'"); *cf. Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (federal habeas relief does not lie for errors of state law). In other words, this court's analysis of the federal habeas claim accepts that (a) Drawn's conviction became final on November 7, 2017, and (b) under California law, the SB 620 amendments did not apply to cases, such as Drawn's, that had become final before SB 620 took effect on January 1, 2018.

[3] The superior court referred to the date the law was "enacted," but the context shows that the court meant the date the law became effective.

14

2. Analysis

The Fourteenth Amendment's Equal Protection Clause provides that no state shall deny to any person "the equal protection of the laws." U.S. Const. amend. XIV. The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). When state action "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution," that action must be analyzed under strict judicial scrutiny. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). When neither a suspect class nor a fundamental right is implicated, the appropriate standard of analysis is rational basis review, which requires only that disparate treatment be "rationally related to legitimate government interests." *Schweiker v. Wilson*, 450 U.S. 221, 230 (1981). The rational basis standard presents a significant obstacle to an equal protection claim, as "legislative solutions must be respected if the 'distinctions drawn have some basis in practical experience.'" *McGinnis v. Royster*, 410 U.S. 263, 276 (1973) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 331 (1966)).

The starting point is to determine the appropriate level of review for this case. Although Drawn was treated differently than persons whose convictions became final on or after January 1, 2018, that fact does not make him a member of a suspect class. *See Frontiero v. Richardson*, 411 U.S. 667, 682 (1973) (describing classifications based on sex, race, alienage, and national origin as "inherently suspect"). And, although liberty is affected when a defendant is sentenced following a conviction, this alone does not mean that different sentences impinge on a fundamental right. *Cf. United States v. Harding*, 971 F.2d 410, 412 (9th Cir. 1992) (holding that a longer sentence for an offense involving crack cocaine rather than powder cocaine does not implicate a fundamental or quasi fundamental right); *McQueary v. Blodgett*, 924 F.2d 829, 834 (9th Cir. 1991) ("Legislators do not likely intend to create liberty interests when they draft guidelines to govern the imprisonment of state convicts."). Because Drawn is neither a member of a suspect class nor being denied a fundamental right, rational basis review properly applies to his claim and requires only that the disparate treatment be rationally related to a legitimate state interest. *See Foster v. Washington State Board of Prison Terms and Paroles*, 878 F.2d 1233, 1235 (9th Cir. 1989); *McQueary*, 924 F.3d at

15

834–35.

Improvement of sentencing laws is a legitimate government interest. *See Foster*, 878 F.2d at 1235 (denying an equal protection challenge to prospective-only application of a new sentencing law under the rational basis standard); *McQueary*, 924 F.2d at 834–35 (citing *Foster* with approval). In order to make a statutory change to give judges discretion over sentence enhancements for firearms, California chose a starting point for its new sentencing scheme. Setting a starting date and applying statutory changes prospectively is not inherently unconstitutional. *See Sperry & Hutchinson Co. v. Rhodes*, 220 U.S. 502, 505 (1911) ("[T]he Fourteenth Amendment does not forbid statutes and statutory changes to have a beginning and thus to discriminate between rights of an earlier and later time."). In the context of sentencing, the Ninth Circuit has held that "'[t]here is nothing unconstitutional in a legislature's conferring a benefit on prisoners only prospectively.'" *Jones v. Cupp*, 452 F.2d 1091, 1093 (9th Cir. 1971) (quoting *Comerford v. Commonwealth*, 233 F.2d 294, 295 (1st Cir. 1956)) (denying an equal protection challenge to the failure to apply retroactively a statutory reduction in the maximum sentence for second-degree murder).

The Alameda County Superior Court cited to *People v. Floyd*, 31 Cal. 4th 179 (Cal. 2003), in support of its conclusion that the sentencing improvements brought about by the SB 620 amendments could be limited to prospective application. *Floyd* predated SB 620 and concerned another change to California's sentencing laws, Proposition 36's reduction of punishments for certain nonviolent drug offenses. *Floyd* determined that there was no equal protection violation in applying the Proposition 36 sentencing changes only to convictions occurring after the effective date of the new law. *See id.* at 188-91 (finding that Proposition 36, which generally provided for probation rather than imprisonment for nonviolent drug possession offenses, applied prospectively and did not violate equal protection principles in doing so). *Floyd* identified several reasons that provided a rational basis for California to apply the new sentencing law prospectively only: "'assur[ing] that penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written'"; preventing numerous resentencing hearings of defendants who had already been sentenced under the former law; discouraging sentencing delays and other manipulation of the law; and deterring defendants from filing meritless appeals simply to delay the

16

1 time of finality. *Id.* at 190-91. Those same reasons would provide a rational basis for California to apply the SB 620 amendments prospectively only.

Although it may seem harsh to a person, such as Drawn, who ends up on the wrong side of the dividing line for the application of a new law, a state is allowed to legislate prospectively or retroactively without running afoul of the Equal Protection Clause. California's decision to make the SB 620 amendments prospective in operation is rationally related to the legitimate government interest in improving the state's sentencing scheme. The Alameda County Superior Court's rejection of Drawn's equal protection claim thus was not contrary to, or an unreasonable application, of clearly established federal law as set forth by the U.S. Supreme Court. *Accord Peters v. Sherman*, No. EDCV 19-1016-PA (GJS), 2019 U.S. Dist. LEXIS 98142, at *10 (C.D. Cal. June 11, 2019) (rejecting equal protection challenge to the SB 620 amendments because there is no clearly established federal law recognizing a Fourteenth Amendment violation when a new law or amendment is applied prospectively). Drawn is not entitled to habeas relief on this claim.

C. No Certificate of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is DENIED.

**CONCLUSION**

The petition for writ of habeas corpus is DENIED. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: October 15 , 2019

_____
SUSAN ILLSTON
United States District Judge